Eve ATKINSON, Plaintiff,

v.

**LAFAYETTE COLLEGE,**
**et al., Defendants.**

**Civil Action No. 01–2141.**

United States District Court,
E.D. Pennsylvania.

Sept. 9, 2009.

Alan B. Epstein, Jennifer L. Myers, Spector Gadon & Rosen, PC, Philadelphia, PA, for Plaintiff.

Barry Simon, Dara Penn Newman, Ogletree Deakins Nash Smoak & Stewart P.C., John G. Harkins, Jr., Neill C. Kling, Harkins Cunningham, Philadelphia, PA, for Defendants.

### *MEMORANDUM*

BUCKWALTER, Senior District Judge.

Currently pending before the Court is a Motion by Defendant Lafayette College for Summary Judgment, the Response thereto of Plaintiff Eve Atkinson, and Defendant's Reply Brief. For the following

reasons, the Motion is granted and the case is dismissed in its entirety.

## I. BACKGROUND

### A. *Statement of Facts* [1]

Plaintiff, Eve Atkinson, received her bachelor and masters degrees from West Chester University, and a doctorate in education from Temple University. (Pl.'s Resp. Mot. Summ. J., Ex. V.) In November 1989, she met with Herman Kissiah, Dean of Students at Defendant Lafayette College ("Lafayette" or "the College"), in connection with an opening in the athletics department. (Def.'s Mot. Summ. J., Ex. B, Eve Atkinson Dep. ("Atkinson Dep."), 23:22–25:4, Nov. 22, 2002, Dec. 17, 2002, Sep. 19, 2008.) [2] On December 28, 1989, the College hired her in the position of Director of Athletics and Professor and Head, Physical Education and Athletics, thereby making her the first woman appointed as athletic director in a coed Division I–AA program. (*Id.* at 84:14–19; Def.'s Mot. Summ. J., Ex. A.) Her appointment letter stated, as follows:

> [Lafayette College] is pleased to appoint you to the position of Director of Athletics and Professor and Head, Physical Education and Athletics, effective January 29, 1990, with term thereafter at the pleasure of the President of the college and the board of Trustees. It is further understood that your initial appointment will be through June 30, 1992, and that you would be subject to the procedures *for due notice as apply to the faculty* which would ensure you a minimum of one year's notice.

(Def.'s Mot. Summ. J., Ex. A.) As Plaintiff testified, Dean Kissiah told her that "the position was a position with faculty appointment. It was an administrative position plus a faculty appointment position.... He said the position was not offered at that time with tenure, but that it was a faculty position and that it would be controlled by the faculty handbook." (Atkinson Dep. 54:2–22.) Effectively, it encompassed three roles: (1) full professor; (2) department head; and (3) director of athletics. (*Id.* at 57:16–19.)

Plaintiff was not terminated after her initial two and a half year term. Rather, from July 1, 1990 to July 1, 2000, Plaintiff was notified, on an annual basis, of salary increases. (Def.'s Mot. Summ. J., Ex. J.)

Part of Plaintiff's responsibility involved ensuring compliance with Title IX of the Education Amendments of 1972. which prohibits, in part, sex discrimination under any education program or activity receiving federal financial assistance. 20 U.S.C. § 1681, *et seq.* Throughout her tenure with the College. Plaintiff was involved with Title IX issues, including advocating for both female employees and female students in the athletic programs. (Atkinson Dep. 150:8–18, 425:11–426:9, 507:12–508:1.) Part of her obligations included looking at the subject of gender equity under Title IX, ensuring that the College was in compliance with Title IX and, if it was not in compliance, "to offer remedies to resolve that." (*Id.* at 363:14–365:3.) As Plaintiff testified, the President of the College, Dr. Ellis, encouraged her to address issues regarding the disparities between men's and women's sports at the College. (*Id.* at 161:16–24.) Such encouragement was ongoing from at least 1992 through to the tenure of later President Arthur Rothkopf. (*Id.* at 575: 21–576:1.)

---

1. The statement of facts is compiled from a review of the parties' briefs and the evidence submitted in conjunction with those briefs, taken in the light most favorable to Plaintiff.

2. Although Plaintiff's deposition was taken over three separate days, in three separate years, the transcript numbers the pages of her deposition consecutively.

From the outset of her appointment, Plaintiff complained about gender inequities in the Department of Athletics and regularly made recommendations on Title IX issues. (*Id.* at 364:9–365:3; 555:22–556:13, 572:6–576:12; Pl.'s Resp. Mot. Summ. J., Ex. J, Atkinson Aff. ("Atkinson Aff.") ¶ 8, Feb. 18, 2003.) In the course of her almost decade-long employment, Plaintiff worked on increasing scholarships to women athletes, (*id.* 159:22–156:3). equitable funding of sports programs, (*id.* at 245:3–12), hiring full-time as opposed to part-time coaches for the women's athletic programs. (*id.* at 287:12–24), and ensuring equal pay for the female coaching staff. (*Id.* at 425:11–426:9. 507:12–20.) Patricia Fisher, the women's basketball coach and later the College's assistant athletic director, testified that Plaintiff was vocal in her advocacy for Title IX compliance and voiced her opinions openly at committee meetings. (Pl.'s Resp. Mot. Summ. J., Ex. C. Patricia Fisher Dep. ("Fisher Dep."), 22:1–23:19, Dec. 17, 2008.)

In January of 1996, Plaintiff became involved with a College self-study designed, in part, to evaluate the College's efforts on gender and racial equality. (Def.'s Mot. Summ. J., Ex. C, Leslie Muhlfelder Dep. ("Muhlfelder Dep."), 17:17–19:4, Dec. 18, 2008.) The findings were to be presented to the National Collegiate Athletic Association ("NCAA"). (*Id.*) Leslie Muhlfelder, the College's General Counsel, was appointed by President Rothkopf to chair the Subcommittee on Commitment to Equity because of her knowledge of Title IX. (Muhlfelder Dep. 18:13–19:4; Atkinson Dep. 632:12–633:11.)

Although Plaintiff was not a member of the Subcommittee, she saved as staff to provide information regarding the athletics department. (Muhlfelder Dep. 20:6–21:4.) In that role, she repeatedly raised issues of gender equality in the context of the College's athletic budget. (Atkinson Aff. ¶ 9.) For example, in the summer of 1996, Plaintiff presented a multitude of points to Dean Kissiah, to which he responded as follows:

> Let me pick up on a couple of items on your retreat. Clearly the program was a comprehensive one and covered the many issues facing our athletic program. I commend you for the way you've organized the department for the benefit of Lafayette.
>
> I do want to call your attention to a couple of minor points on which we might want to move slowly. I note these as follows:
>
> 1. Mission Statement—lets go slow on putting this down on parchment and displaying it in the lobby. I do want approval of the Board by September 28 before we go widely public.
>
> 2. NCAA Certification—I do agree that we need to meet these deadlines and I will do better this next year.
>
> 3. Addition of Women's Crew—I suggest we don't even bother with this one at this time. I will be happy to discuss with you at some length if need be.
>
> 4. Hoops Pass—we can discuss later on as noted in an earlier memo to you.
>
> 5. Logo—Good idea. Make sure that Scott keeps Glenn fully advised and that it is consistent with what Glenn wants to do with the College's overall program.
>
> 6. Twenty Five Years of Women's Athletics—Great idea, maybe AJR [President Rothkopf] will give us some money on this one.

(Pl.'s Resp. Mot. Summ. J., Ex. W.) Further, in an October 30, 1996 memorandum from Plaintiff to Muhlfelder, Plaintiff dem-

onstrated her continued awareness of and advocacy for Title IX issues:

> Listed below are the needs we feel need to be addressed by the committee and items of recommendations to be included in the final report of the Commitment to Equity Committee. These needs are ones that we believe are necessary to enable the Department of Athletics and Physical Education to become more equitable within its entire program.
>
> 1. Add on full-time assistant coaches of Women's Sports.
> 2. Elevate one part-time head coach of a women's sport to full-time status.
> 3. Hire a minority female coach(es) for a women's team(s),
> 4. Recruitment of additional minority student-athletes for women's teams.
> 5. Renovate locker room facilities at Kirby Field House.
> 6. Renovate McCracken Field House for additional women's locker rooms.
> 7. Add two additional outdoor playing fields at Metzgar for women's teams.
> 8. Separate budget accounts for the same or like sports that have different Head Coaches.
> 9. Re-evaluate coaching positions for teams and discuss overlapping of coaching and other job responsibilities.
>
> We would be available to discuss the justifications of these items with the committee and would be grateful for any help the committee could offer to our department in these areas. Thank you for your assistance.

(Pl.'s Resp. Mot. Summ. J., Ex. E.)

The full report of the College self-study was submitted to the NCAA in fall 1997. (Muhlfelder Dep. 21:19–24.) It concluded that, as of June 30, 1996, the College had demonstrated equitable treatment of men and women in various areas, but recommended renovation of women's locker room space at Kirby House and McCracken Field House. (Def.'s Mot. Summ. J., Ex. D.) In addition, the report deferred to the Gender Equity Plan developed by Plaintiff and her staff recommending elevation of a part-time women's team coaching position to full-time equivalency by June 30, 1999, and implementation of a long-range plan for reallocating coaching staff and positions within the Department by June 30, 2000, to provide more full-time recruitment of female student-athletes. (*Id.*)

In May of 1998. the NCAA certified the College as compliant with Title IX and indicated that any Title IX plans for improvement outlined by the College had to be implemented according to the College's self-imposed deadlines. (Atkinson Dep., Ex. 30.) Additionally, the NCAA imposed several requirements that did not affect current certification, but which the College would be required to enact in order to maintain certification. (*Id.*) The NCAA and President Rothkopf corresponded about these latter requirements over the summer of 1998. (*Id.* Ex. 31.) By August 20, 1998, the NCAA conclusively determined that "the actions taken by the institution satisfy the requirement established by the committee related to reviewing the university's gender-equity plan with the goal of increasing female student-athlete opportunities." (*Id.*)

According to Plaintiff, her dispute with the College administration accelerated in mid–1998, when she began to push the College to expend additional funds for expanding women's athletics. (Atkinson Dep. 626:6–628:8.) Both President Rothkopf and Dean Kissiah explained that they were unwilling to allocate any more of the College's funds for athletics, and told Plaintiff that she had to work with the

department's current funds to attain total Title IX compliance. (*Id.* at 628:9–629:18.) Accordingly, the issue, as described by Plaintiff, became not whether to be compliant with Title IX, but the source of the money necessary to achieve that compliance. (*Id.* at 631:24–632:22.) Plaintiff conceded that Muhlfelder, the person within the university charged with determining Title IX compliance, was supportive of Plaintiff's efforts. (*Id.* at 632:23–633:9.)

When Plaintiff's push for new funds was rejected by the administration, she attempted to reshuffle the department's existing funds and develop a plan to cut certain sports, while adding others, in order to attain further Title IX compliance measures. (*Id.* at 590:17–591:7; Muhlfelder Dep. 38:24–39:10; 40:8:42:5.) The resulting "Plan to Enhance the Department of Athletics and Physical Education" was approved by President Rothkopf and submitted to the Board Committee for Athletics and Student Affairs in October 1998. (Def.'s Mot. Summ. J., Ex. F, Arthur Rothkopf Dep. ("Rothkopf Dep. (2008)"), 27:11–30:16, Nov. 24, 2008.) The Plan recommended the elimination of four varsity sports—baseball, men's lacrosse, fencing, and volleyball—and four junior varsity sports—football, men's basketball, field hockey, and women's lacrosse. (*Id.* Ex. 58, 14.) These actions would have made approximately $172,000 available for distribution to other varsity sports, including the cost of two-full time coaching positions that would be reallocated to women's soccer and either field hockey or women's lacrosse. (*Id.*)

Upon review of this proposal, however, the Board of Trustees Committee on Athletics and Student Affairs decided that before approving any such changes, it should conduct a broader and more comprehensive study of the entire athletic program. (Rothkopf Dep. (2008) 33:14–34:13.) The Board indicated that it would take a hard, realistic look at the capital and operating costs of making Lafayette's athletic program competitive. (*Id.* at 34:14–35:7.) This study was designed to determine whether the College should maintain all of its intercollegiate athletic activities at the Division I level of the NCAA rankings, or alternatively, and pursuant to a proposal by President Rothkopf, decrease its spending on athletics by either eliminating the men's football program entirely or going down to a Division III status. (Atkinson Dep. 587:16–588:14.)

Plaintiff remained strongly opposed to both eliminating football and altering the divisional status, as she felt it was not in the best interests of the College to do so in the middle of the capital campaign. (*Id.* at 426:21–427:17; 588:17–589:6.) On October 26, 1998, during the Board study of the Athletics Department, Plaintiff called a specially-scheduled meeting with all of the student-athletes to express her continued opposition to these alternate proposals. At this meeting, she stated:

I, the senior athletic administration and coaching staff are firmly committed to keeping the "excellence" in the Lafayette Experience. We are fully committed to fighting to have Lafayette's athletic program remain in Division I and to be competitive within the Patriot League. 1 personally will fight this battle with respect and diligence until I am fired or die in the job. I have formally expressed my strong viewpoints regarding retaining Division I status to the Central Administration. This Division 1 vs. Division III battle has been on going every two years for the past nine years. I am committed to fighting this battle again through this academic year. But I need your help, support and we must network together with the faculty, administration and alumni. We need to

remain as a united department for getting additional resources as a Division I institution. (Atkinson Dep., Ex. 17, A–04374–75.) Notably. Plaintiff made no mention of any Title IX issues in her outline for the meeting. Neither Dean Kissiah nor President Rothkopf confronted Plaintiff about her organized protest. (Atkinson Aff. ¶ 17.)

Tensions between Plaintiff and College administration came to a head in November of 1998, during the course of the Board study. The remaining dispute concerned the lack of money to fund the athletic department as a whole, which, by its nature, encompassed funding to ensure gender equity. (Atkinson Dep. at 613:1–19.) Dean Kissiah and Plaintiff had previously reviewed projected costs of funding a co-ed Division I athletic program generally, but, during a November 18, 1998 meeting of a subcommittee of the faculty reviewing the status department, Dean Kissiah presented inflated versions of Plaintiff's projections and numbers without ever informing Plaintiff that he had changed her figures. (Id. at 169:21–170:9; 177:17–178:5; 336:1–11.) After the meeting, Plaintiff confronted him and indicated that he did not make an accurate representation to the Board since he altered figures that were presented on her behalf. (Id. at 169:21–14; 175:19–176:12.) Further, she complained that he had unfairly surprised her, in violation of the President's guidelines, by not telling her about the changed figures prior to the meeting. (Id.) According to Plaintiff, Kissiah then became very "irate." approached her and stood over her with his fist clenched and raised over her head, threatening her and trying to intimidate her. (Id. at 170:15–22.) He said things to the effect of "this is the way it will be, take it or leave it," "[y]ou want everything your way," and "I've **had** it up to here [raising his hand] with athletics and all of this report."[3] (Id. at 170:22–171:4.) Plaintiff felt physically threatened, intimidated, upset, and brought to the point of tears because of his unprofessional behavior. (Id. at 170:22–23, 174:1–10, 178:21–179:17.) This was the first time that Kissiah had ever acted in this way toward Plaintiff, and it never happened on any subsequent occasion. (Id. at 180:15–181:3.)

Immediately thereafter. Plaintiff reported the incident both to Muhlfelder, who also served as the director of human resources, and to President Rothkopf. (Atkinson Dep. 172:1–14.) Plaintiff indicated that Kissiah's behavior was unprofessional, that the President's directive regarding not surprising people in meetings was not followed by Kissiah, and that "the whole point was that he wasn't playing fair" by presenting documents at that meeting that he had not shared with her prior to the meeting. (Id. at 335:2–336:19.) She wanted to "go on notice that this was not proper professional behavior, that [she] would not subject [herself] to that again and be emotionally upset that way again by [her] supervisor and that . . .

---

**3.** As noted by Defendant, Dean Kissiah denied that he ever yelled at Plaintiff with clenched fists in an effort to intimidate and harass her. (Def.'s Mot. Summ. 1 Ex. G Herman Kissiah Dep. ("Kissiah Dep."), 125:22–127:9, Dec. 31, 2002.) He indicated that they had a discussion during which she became very upset at his failure to include her numbers in his report She commented that he would be able to retire someday and do whatever he wanted, but all she had was the athletic program at Lafayette College and he was trying to destroy it. (Id. at 127:4–128:3.) He denied ever using clenched fists and yelling at her while she was sitting down. (Id. at 128:4–129:15.)

Notwithstanding this alternate account, this Court must, on summary judgment review take the facts in the light most favorable to Plaintiff. Accordingly, for purposes of this Motion the Court disregards Dean Kissiah's testimony and fully accepts Plaintiff's testimony to represent the facts as they occurred.

some action should be taken." (*Id.* at 337:19–338:1.) During her subsequent deposition, she stated her belief that this was discrimination against her due to her position on the general funding of both men's and women's sports, as follows:

Q. You believe you were discriminated against or retaliated against because you oppose the budgetary allocations to men's and women's sports?

A. It's not opposed. It's the issue that more funding—I was very clear on more funding, and the president knew this, the president knew this from board meetings, the members of the board knew it from 1996 on, that more money needed to be spent. It's written in the board documents and the president knew that.

Q. So it had to do. however, with the funding of the men's and women's programs?

A. That's correct.

(*Id.* at 338:24–340:5.) Despite Plaintiff's report of this incident, neither Rothkopf nor Muhlfelder ever met with Kissiah or discussed it with him. (Kissiah Dep. 101:14–102:20.)

The day after the incident. Dean Kissiah left Plaintiff a phone message saying that he was disappointed that their encounter was not more productive. (Atkinson Dep. 393:2–24.) During a subsequent meeting, Plaintiff told him that she did not enjoy being treated the way he treated her, to which he responded that "this was a pressure time and, that he was under pressure and this whole study on athletics was very trying on everyone." (*Id.* 394:14–24.) She never raised the incident again with him. (*Id.* at 396:7–11.) Plaintiff agreed that everyone working on the Board study felt under pressure. (*Id.* at 395:11–14.)

In January of 1999, the Board completed its study and elected to both retain the College's Division I status and conduct an additional capital campaign for athletics. (*Id.* at 552:7–18.) As a result of the additional funding, the Board passed a resolution, on April 9, 1999. making money available for the addition of three new coaching positions: head women's soccer coach, head women's lacrosse coach, and full-time women's softball coach, thereby putting the College, in Plaintiff's view, in full compliance with Title IX. (*Id.* at 553:7–555:21; 595:10–597:1.)

According to Plaintiff, subsequent to her complaints about Kissiah's actions, she was subject to various forms of purportedly retaliatory behavior designed to weaken her faculty position and tenure status. For example, in April of 1999, intramurals and recreation, a significant component of her physical education position, was taken out of her supervision. (*Id.* at 286:12–19.) Moreover, from January 15, 1999, until his retirement on October 31, 1999, Dean Kissiah met with President Rothkopf and raised concerns about whether Plaintiff should continue to lead the athletics department. (Kissiah Dep. 122:20–123:17.) Kissiah further indicated to Rothkopf that he had spoken with members of the football staff, field hockey program, and administrative department, who expressed concern that leadership was not taking them where they needed to go, and that morale was low based on frustration with the department's management. (*Id.* at 123:13–124:17.)

Finally, in August 1999, Kissiah prepared a detailed written evaluation of her performance, which, in some regards, was highly complimentary, and in other regards raised concerns about her leadership abilities.[4] Ultimately, the evaluation concluded with the following summary:

---

4. Plaintiff claims that this was the first written evaluation she had ever received. (Pl.'s

As Director, Eve brings to the position many strengths. She is highly organized, dedicated, and gives enormous amounts of time to complete the task. Responsibilities are complicated by the fact that the College budget does not permit as complete an administrative staff as is generally necessary for a program of this magnitude. On the other hand, Eve's relationships with staff, both within and without her department, are sometimes problematic. Her single-minded dedication to the Intercollegiate Athletic Program has hurt her in the eyes of other divisional staff who believe they give regularly of their time and effort to broader College programs. Eve has enabled the College to develop a strong athletic schedule, although our win/loss record is not good. The resources that have now been provided will "raise the ante" and more will be expected. At the conclusion of my first four or five evaluations I told her to relax and quit trying to win the job all over again. While one can appreciate her single-minded dedication, there are times when one must loosen up, listen to the comments and criticisms of others, and try to modify behavior.

(Pl.'s Resp. Mot. Summ. J., Ex. M.) Upon receipt of the eleven-page evaluation, Plaintiff responded to Dean Kissiah with a detailed letter request that he raise his final evaluation rating of "Meets Expectations" to "Exceeds Expectations." (*Id.*) By way of memoranda dated on October 4, 1999 and October 14, 1999, Dean Kissiah declined to change his summary evaluation rating, and indicated that both the evaluation and her comments would be forward-ed to the Office of Human Resources. (Pl.'s Resp. Mot. Summ. J., Ex. N.)

On November 4, 1999, President Rothkopf summarily terminated Plaintiff from all of her positions with the College, effective June 30, 2001, stating that he believed that "the Athletics Department would benefit from new leadership." (Def's Mot. Summ. J., Ex. H.) Although Plaintiff asked him for more specific reasons, he never supplied any answers. (Atkinson Dep. 353:8–353:18, 360:18–361:11, 470:15–20, 510:4–511:22, 546:12–18.) Rothkopf conceded that following Plaintiff's notice of non-reappointment, he did not provide her with any writing that would have allowed her to know the full basis of his decision. (Rothkopf Dep. (2008) 59:7–13.)

After the filing of the present lawsuit, Rothkopf, upon questioning, began to articulate reasons for Plaintiff's termination. (Def's Mot. Summ. J., Ex. I, Resp. to Interrogatory 3.) Specifically, he indicated:

[T]he termination decision was based on the conclusion that new leadership was needed in the Athletics Department. The President of the College concluded, in consultation with others, that Plaintiff was not the right person to lead the Athletics Department in the future. The President of the College believed that Plaintiff's leadership and management skills were deficient. He believed that her management style alienated others and led to poor relations and low morale in the Athletics Department and to working relationships with others in College administration that were not constructive. The President of the College also believed that Plaintiff had ex-

---

Resp. Mot. Summ. J. 10.) Defendant, however, *points to Dean Kissiah's report, which references his "first four or five evaluations."* (Pl.'s Resp. Mot. Summ. J., Ex. M EA–15852.) Nonetheless, Defendant has not produced any other written evaluations from Plaintiff's per-

sonnel file. As the Court must view the evidence in the light most favorable to Plaintiff, we assume that the August 1999 evaluation was the first *written* evaluation for Plaintiff during her tenure with the College.

ercised poor judgment in a variety of situations, which lessened his confidence in her abilities. Moreover, Plaintiff's conduct during the study of athletics by the College's Board of Trustees during 1998 and into January of 1999, mentioned in the answer to interrogatory 2, diminished his confidence in her judgment and in her willingness to support his administration.

The President consulted with the Dean of Students. Herman C. Kissiah, at various times, and with his successor in that position. James Krivoski, about the decision to issue the termination notice. They supported the termination decision. He also sought legal advice from the College's General Counsel, Leslie Muhlfelder. The Executive Committee of the Board of Trustees were informed of this decision on various occasions.

(*Id.*) Moreover, in Response to Interrogatory Two, Rothkopf indicated:

Plaintiff's leadership and management skills were deficient. Plaintiff did not have a constructive working relationship with numerous people at the College. Her management style contributed to poor relations and low morale among personnel in the Athletics Department and poor working relationships with individuals working in other divisions in the College.

Plaintiff exercised poor judgment in a variety of ways. This includes, for example, the matter identified in the first four "bullets" under the heading Teamwork and Communication in her performance evaluation in 1999, and in connection with the matter of the President's approval or instructions mentioned in the note dated January 19, 1999.... Plaintiff also acted inappropriately by fomenting opposition to possible changes to the College's intercollegiate athletics program that were under

consideration by the Board of Trustees during 1998 and into the beginning of 1999. Her actions undermined the College's ability to conduct a reasoned study as called for by the Board. Also, Plaintiff at times would not follow the instructions of her supervisor James Krivoski.

(*Id.* at Resp. to Interrogatory 2.)

Similarly, in deposition testimony, both Rothkopf and Kissiah offered insight into the basis for Plaintiff's termination. Rothkopf indicated that Plaintiff had become insubordinate, after the Board of Trustees announced that it wanted to conduct a dispassionate study of the College's athletic program, by organizing a group of student athletes to oppose any changes in the College's athletic program and to effectively protest any dropping of sports or change in the status of the College's division. (Rothkopf Dep. (2008) 41:17–42:11.) He considered her to be going beyond what was appropriate for an employee of the college. (*Id.* at 42:11–15.) Additionally, Rothkopf cited various conversations he had had with other individuals in the College's community in which they expressed their concerns about Plaintiff's management style. (*Id.* at 67:3–69:13.)

Moreover, Dean Kissiah testified that President Rothkopf expressed concern about Plaintiff's efforts to end-run Kissiah's authority. (Kissiah Dep. 87:8–88:5.) Kissiah also stated that he spoke with members of the football staff, head coach of the field hockey program, and several administrative officers—all of whom reported low morale and poor leadership. (*Id.* at 123:18–124:11, 135:8–136:18, 162:1–8.)

Even after her non-reappointment. Plaintiff continued to press for the College's Title IX compliance. (Pl's Resp. Mot. Summ. J., Exs. P, Q, R.) President Rothkopf assumed that she would do so

"because that was part of her responsibility." (Rothkopf Dep. (2008) 59:15–20.) New gender equity goals were both planned and implemented past the date of Plaintiff's termination. (Pl.'s Resp. Mot. Summ. J., Ex. S (Gender Equity Plan revised on July 6, 2000), Ex. T (Draft Gender Equity Plan dated May 7, 2002).)[5]

## B. Procedural History

Plaintiff filed a complaint under the Pennsylvania Human Relations Act ("PHRA"), 43 Pa. Stat. 951, *et seq.*, on May 2, 2000. The complaint challenged her termination and the denial of both her tenure status and requested faculty appeals. *See Atkinson v. Lafayette*, 460 F.3d 447, 451 (3d Cir.2006) (setting forth procedural history). In particular, she claimed that she was terminated and denied a faculty appeals because of her gender and the College's pattern and practice of discharging qualified female employees—a practice to which similarly situated males had not been subject. *Id.* She did not allege retaliation in this complaint, which was also filed with the federal Equal Employment Opportunity Commission ("EEOC"). *Id.*

Subsequently, in responding to an EEOC questionnaire concerning her employment claim. Plaintiff asserted that the basis for her discharge was sex, retaliation, and age. *Id.* As to the retaliation claim, she specified that her notice of termination was retaliation against her for her insistence that Title IX anti-discrimination law be followed or, in other words, that equal funding and personnel be given to both women's and men's sports programs. *Id.*

Plaintiff initiated the current federal action on May 1, 2001, alleging: (1) gender discrimination and retaliation under Title VII and the PHRA (Counts I and II); (2) retaliation in violation of Title IX (Count III); and (3) breach of contract (Count IV). Upon consideration of Defendants' Motion to Dismiss, this Court granted the motion as to Atkinson's claims of breach of contract and Title VII claims against President Rothkopf, individually. The Court further dismissed her retaliation claim under Title IX, finding no private right of action to enforce such claims, pursuant to *Alexander v. Sandoval*, 532 U.S. 275, 121 S.Ct. 1511, 149 L.Ed.2d 517 (2001). *Atkinson v. Lafayette College*, Civ. A. No. 01–2141, 2002 WL 123449 (E.D. Jan. 29, 2002). Subsequently, this Court granted Defendants' Motion for Summary Judgment as to all of Plaintiff's remaining counts. *Atkinson v. Lafayette College*, Civ. A. No. 01–2141, 2003 WL 21956416 (E.D.Pa. Jul. 24, 2003).

Plaintiff appealed to the United States Court of Appeals for the Third Circuit, which affirmed all of this Court's previous rulings, save for the dismissal of Plaintiff's Title IX retaliation claim. *Atkinson v. Lafayette College*, 460 F.3d 447 (3d Cir. 2006). The Third Circuit noted that, subsequent to this Court's January 2002 decision on the Motion for Summary Judgment, the United States Supreme Court had issued a ruling in *Jackson v. Birmingham Bd. of Ed.*, 544 U.S. 167, 125 S.Ct. 1497, 161 L.Ed.2d 361 (2005), which held that Title IX's private right of action encompassed claims of retaliation against an individual. *Atkinson*, 460 F.3d at 451–52. Accordingly, the Third Circuit vacated the dismissal of Plaintiff's Title IX retaliation

---

**5.** In prior discussions of this case, the parties focused on events occurring after her termination, with regard to whether she was entitled to a hearing before the faculty tenure review appeals committee. As all of the counts involving these facts have been dismissed on summary judgment by this Court, and as the decision has been affirmed by the Third Circuit Court of Appeals, the Court declines to rehash these facts.

claim and remanded it back to this Court for further proceedings consistent with *Jackson.* *Id.*

Following additional discovery. Defendant Lafayette College filed the present Motion for Summary Judgment as to Count III. The Motion alleges that Plaintiff has failed to produce sufficient evidence to support a *prima facie* case that her dismissal from employment was in retaliation for opposition to practices made unlawful by Title IX. Further, it alleges that Plaintiff neglected to raise a genuine issue of material fact that the College President's reasons for her dismissal were untrue and, instead, a pretext for Title IX retaliation. Plaintiff responded on March 23, 2009, and Defendant filed a Reply Brief on April 27, 2009. The Court now turns to a discussion of this remaining issue.

## II. STANDARD OF REVIEW

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R.CIV.P. 56(c). A factual dispute is "material" only if it might affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). For an issue to be "genuine," a reasonable fact-finder must be able to return a verdict in favor of the non-moving party. *Id.*

On summary judgment, it is not the court's role to weigh the disputed evidence and decide which is more probative, or to make credibility determinations. *Boyle v. County of Allegheny, Pa.,* 139 F.3d 386, 393 (3d Cir.1998) (citing *Petruzzi's IGA Supermarkets, Inc. v. Darling–Del. Co. Inc.,* 998 F.2d 1224, 1230 (3d Cir.1993)). Rather, the court must consider the evi-

dence, and all reasonable inferences which may be drawn from it, in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (citing *U.S. v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962)); *Tigg Corp. v. Dow Corning Corp.,* 822 F.2d 358, 361 (3d Cir. 1987). If a conflict arises between the evidence presented by both sides, the court must accept as true the allegations of the non-moving party, and "all justifiable inferences are to be drawn in his favor." *Anderson,* 477 U.S. at 255, 106 S.Ct. 2505.

Although the moving party bears the initial burden of showing an absence of a genuine issue of material fact, it need not "support its motion with affidavits or other similar materials negating the opponent's claim." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). It can meet its burden by "pointing out ... that there is an absence of evidence to support the nonmoving party's claims." *Id.* at 325, 106 S.Ct. 2548. Once the movant has carried its initial burden, the opposing party "must do more than simply show that there is some metaphysical doubt as to material facts." *Matsushita Elec.,* 475 U.S. at 586, 106 S.Ct. 1348. "There must ... be sufficient evidence for a jury to return a verdict in favor of the non-moving party; if the evidence is merely colorable or not significantly probative, summary judgment should be granted." *Armbruster v. Unisys Corp.,* 32 F.3d 768, 777 (3d Cir.1994), *abrogated on other grounds, Showalter v. Univ. of Pittsburgh Med. Ctr.,* 190 F.3d 231 (3d Cir.1999).

## III. DISCUSSION

██ As noted above, this suit's sole remaining count involves Plaintiff's allegation of retaliation based on her activity under Title IX. Title IX provides that "[n]o

person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). In other words, it bars sex discrimination by recipients of federal education funding. *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 173, 125 S.Ct. 1497, 161 L.Ed.2d 361 (2005). In 2005, the United States Supreme Court explicitly determined that "[r]etaliation against a person because that person has complained of sex discrimination is another form of intentional sex discrimination encompassed by Title IX's private cause of action. Retaliation is, by definition, an intentional act. It is a form of 'discrimination' because the complainant is being subjected to differential treatment." *Id.* at 173–74, 125 S.Ct. 1497. Accordingly, the Supreme Court held that "when a funding recipient retaliates against a person *because* he complains of sexual discrimination, this constitutes intentional 'discrimination' 'on the basis of sex,' in violation of Title IX." *Id.* at 174, 125 S.Ct. 1497 (emphasis in original).

■ "In allowing claims for retaliation under Title IX, the Supreme Court has nonetheless neglected to provide a scheme by which they may be analyzed." *Dawn L. v. Greater Johnstown Sch. Dist.*, Civ. A. No. 06–19, 2008 WL 2620170 at *4 (W.D.Pa. Jul. 2, 2008). Following the Supreme Court's lead in turning to Title VII jurisprudence for Title IX cases. lower courts have adopted the Title VII framework to analyze Title IX retaliation claims. *Id.* (citing *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 616, 119 S.Ct. 2176, 144 L.Ed.2d 540 (1999)) (further citations omitted). Under Title VII jurisprudence, a plaintiff must first establish a *prima facie* case of retaliation, which involves a three-prong test showing that: (1) the plaintiff

engaged in protected activity; (2) the plaintiff experienced a materially adverse action either after or contemporaneously with the protected activity; and (3) there was a causal link between the protected activity and the adverse action. *Dawn L. v. Greater Johnstown Sch. Dist.*, 586 F.Supp.2d 332, 374 (W.D.Pa.2008) (citing *Weston v. Pennsylvania*, 251 F.3d 420, 430 (3d Cir.2001)); *see also Theriault v. Dollar General*, 336 Fed.Appx. 172, 173–74 (3d Cir.2009).

■ If a plaintiff can satisfy the three elements of the *prima facie* case, then the subsequent analyses differ depending on the types of evidence available. *Dawn L.*, 586 F.Supp.2d at 375. Where there is direct evidence of retaliation, the defendant must demonstrate, by a preponderance of the evidence, " 'that it would have reached the same decision' absent Plaintiffs' protected conduct." *Id.* (quoting *Price Waterhouse v. Hopkins*, 490 U.S. 228, 261, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989) (O'Connor, J., concurring)). Where, however, the plaintiff has produced only circumstantial evidence of retaliation, the defendant need only respond with " 'legitimate, nondiscriminatory reason[s] for its actions.' " *Id.* (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *Hicks v. Tech. Indus.*, 512 F.Supp.2d 338, 357 (W.D.Pa.2007)). Once the defendant meets that burden of production, the burden shifts back to the plaintiff to show, by a preponderance of the evidence, that the defendant's " 'proffered explanation was false, and that retaliation was the real reason for the adverse ... action.' " *Id.* (quoting *Moore v. City of Phila.*, 461 F.3d 331, 342 (3d Cir.2006) (internal quotations omitted)). "[T]o avoid summary judgment, the plaintiff's evidence rebutting the employer's proffered legitimate reasons must allow a factfinder reasonably to infer

that *each* of the employer's proffered nondiscriminatory reasons ... was either a *post hoc* fabrication or otherwise did not actually motivate the employment action (that is, the proffered reason is a pretext)." *Fuentes v. Perskie,* 32 F.3d 759, 764 (3d Cir.1994) (internal citation omitted). The evidence relied upon by the parties at the *prima facie* stage may and should be considered during the pretext phase as well. *Farrell v. Planters Lifesavers Co.,* 206 F.3d 271, 286 (3d Cir.2000).

In the case at bar. Defendant claims that it is entitled to summary judgment on two grounds. First, it argues that Plaintiff has failed to set forth a *prima facie* case of Title IX retaliation. Second, it contends that, even assuming a *prima facie* case exists, Plaintiff has failed to rebut the College's legitimate, non-discriminatory reasons for its actions. This Court considers each argument individually.

## A. *Whether Plaintiff Has Established a Prima Facie Case of Title IX Retaliation*

As noted above, a *prima facie* case of Title IX discrimination involves three prongs: (1) protected activity; (2) a materially adverse action; and (3) a causal link between the two. *Weston,* 251 F.3d at 430. Defendant concedes, for purposes of this Motion, that Plaintiff's dismissal from her employment with the College fits the definition of an adverse action. (Def.'s Mem. Supp. Mot. Summ. J. 16–17.) Thus, the Court focuses its analysis on prongs one and three.

### 1. *Protected Activity*

"[R]etaliation claims extend to those who oppose discrimination against others." *Jackson,* 544 U.S. at 180, 125 S.Ct. 1497. Accordingly, "[p]rotected activities," as described in the first element, "include complaints of sexual discrimination to the courts, government agencies, or the funding recipient." *Dawn L.,* 586 F.Supp.2d at 374 (citing *Burlington N. & Santa Fe Ry. Co. v. White,* 548 U.S. 53, 68, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006)). "So long as it is 'possible to discern from the context of the statement' that an individual opposed an unlawful practice, public expressions of opposition, including interviews with the press, are also protected." *Dawn L.,* 586 F.Supp.2d at 374 (quoting *Curay–Cramer v. Ursuline Acad. of Wilmington, Del., Inc.,* 450 F.3d 130, 135–36 (3d Cir.2006) (further citations omitted)).

A plaintiff alleging a claim of retaliation need not demonstrate that the conduct he opposed was actually a violation of the law, so long as he possessed a reasonable, good faith belief that the underlying actions of the employer actually violated the law. *Aman v. Cort Furniture Rental Corp.,* 85 F.3d 1074, 1085 (3d Cir. 1996). "To put it differently, if no reasonable person could have believed that the underlying incident complained about constituted unlawful discrimination, then the complaint is not protected." *Wilkerson v. New Media Tech. Charter Sch. Inc.,* 522 F.3d 315, 322 (3d Cir.2008). To that end, however, "not every complaint about unfair practices or perceived slights qualify as 'protected activity.'" *Isler v. Keystone Sch. Dist.,* Civ. A. No. 07–1335, 2008 WL 3540603, at *9 (W.D.Pa. Aug. 12, 2008), *aff'd,* 335 Fed.Appx. 200 (3d Cir.2009). The employee's belief that the activity he opposes is unlawful must be objectively reasonable and held in good faith, and the employee's "opposition" to the unlawful discrimination must not be equivocal. *Moore v. City of Phila.,* 461 F.3d 331, 341 (3d Cir.2006). While informal complaints about unlawful discrimination may suffice as protected activity, the "message must at a minimum convey the speaker's express or implicit protest of discriminatory practices that violate the federal anti-discrimi-

nation statutes." *Isler,* 2008 WL 3540603, at *10. "A general complaint of unfair treatment is insufficient to establish protected activity." *Curay–Cramer,* 450 F.3d at 135.

In the current Motion for Summary Judgment, Defendant contends that Plaintiff failed to show that she engaged in "protected activity." Plaintiff responds that, throughout her employment as Athletic Director for the College, she not only pushed for full compliance with Title IX, but continuously pointed out facets of the athletic program that were not in full compliance, thereby engaging in protected conduct based on a good faith belief that Title IX was being violated. In light of the extensive duration over which this case spans, the Court considers Plaintiff's activities during two different time periods: (a) the period from her hiring in January 1990 to the time of the NCAA certification in May of 1998; and (b) the period from May 1998 to her notice of non-reappointment in November of 1999.

### a. *January 1990 to May 1998*

■ From the period of January 1990 to May of 1998, the evidence establishes that Plaintiff continuously sought Title IX compliance by the College. As noted in detail above, Plaintiff repeatedly and consistently advocated for both female employees and female students in the athletic program. (Atkinson Dep. 150:8–18, 425:11–426:9, 507:12–508:1.) She worked on increasing scholarships to female athletes, ensuring equitable funding of sports programs, hiring full-time coaches for women's sports, and assuring equal pay for female coaching staff. (*Id.* at 159:22–156:3, 245:3–12, 287:12–24, 425:11–426:9, 507:12–20.) Additionally, in connection with the College's NCAA self-study. Plaintiff was an integral and vocal advisor to the Subcommittee on Commitment to Equity, pointing out numerous issues of non-compliance. (Pl's Resp. Mot. Summ. J, Ex. E, W.)

Moreover, the evidence viewed in the light most favorable to Plaintiff proves that she maintained a good faith belief that the College's athletic program was in violation of Title IX. The College engaged in a self-study in order to ensure compliance with Title IX. suggesting it believed it was not in full compliance. Further, the Subcommittee on Commitment to Equity recommended that multiple measures be taken to improve the College's Title IX status, again indicating that the College believed improvement was warranted. Given the College's own belief in its Title IX shortcomings, a reasonable jury could find that Plaintiff held a good faith belief that the College's actions, in the structuring of its athletics department from 1990 to 1998, violated the dictates of Title IX.

Nonetheless, Plaintiff's Title IX activities fail to fall within the realm of "protected conduct" because she never engaged in activity that was either adverse to the College or outside the scope of her position as Athletic Director. The United States Supreme Court, in *Garcetti v. Ceballos,* 547 U.S. 410, 126 S.Ct. 1951, 164 L.Ed.2d 689 (2006). enunciated the general proposition that, in order to state a retaliation claim, complaints made within the scope of an employee's job cannot constitute protected conduct. *Id.* at 421–24, 126 S.Ct. 1951. While limited by its facts to the context of a public employee's rights under the First Amendment, *Garcetti's* broader holding has since been expanded to stand for the more general proposition that. "[i]n cases where it is a third party who is attempting to help the alleged victim of discrimination assert her rights, 'protected activity' is limited to activity that is adverse to the company, or outside the employee's normal employment role; this would include the filing of a complaint, but

not reporting suspected discrimination to a supervisor." *Vidal v. Ramallo Bros. Printing, Inc.,* 380 F.Supp.2d 60, 62 (D.P.R.2005) (citing *Claudio–Gotay,* 375 F.3d at 102 (1st Cir.2004) (Fair Labor Standards Act ("FLSA") retaliation); *McKenzie v. Renberg's, Inc.,* 94 F.3d 1478, 1486 (10th Cir.1996) (FLSA retaliation); *EEOC v. HBE Corp.,* 135 F.3d 543, 554 (8th Cir.1998) (Title VII retaliation)). The Fifth Circuit, in the context of a FLSA claim, succinctly explained the basis for this rule,

> [A] part of any management position often is acting as an intermediary between the manager's subordinates and the manager's own superiors. The role necessarily involves being mindful of the needs and concerns of both sides and appropriately expressing them. Voicing each side's concerns is not only *not adverse* to the company's interests, it is exactly what the company *expects* of a manager.
>
> If we did not require an employee to "step outside the role" or otherwise make clear to the employer that the employee was taking a position adverse to the employer, nearly every activity in the normal course of a manager's job would potentially be protected activity under [Section 215(a)(3) of the FLSA]. An otherwise typical at-will employment relationship could quickly degrade into a litigation minefield, with whole groups of employees—management employees, human resources employees, and legal employees, to name a few—being difficult to discharge without fear of a lawsuit. For those reasons, we agree that an employee must do something outside of his or her job role in order to signal to the employer that he or she is engaging [in] protected activity ...

*Hagan v. Echostar Satellite, L.L.C.,* 529 F.3d 617, 628 (5th Cir.2008).

In *Hutchins v. Wilentz, Goldman & Spitzer,* 253 F.3d 176 (3d Cir.2001), the Third Circuit adopted this principle. In that case, plaintiff, a terminated paralegal, filed a claim against a law firm under the False Claims Act, alleging that the firm submitted fraudulent billing statements to the United States Bankruptcy Court and then retaliated against him for internally reporting those violations. *Id.* at 180. Discovery revealed, however, that plaintiff was asked by a firm partner to investigate certain client bills, with particular attention to the high costs of computerized research. *Id.* at 179. After investigating the matter and discussing it with the firm's paralegal supervisor, plaintiff wrote a short memorandum to the partner expressing concern that the computerized research expenses were billed at a rate of 1.5 times the costs to the client and that paralegals were being used to perform secretarial tasks, resulting in overcharging clients. *Id.* at 179–80. Approximately one month later, plaintiff was called to discuss his allegedly troubled relationships with others at the firm, as well as his continued employment. *Id.* at 180. Subsequently, plaintiff sent a somewhat disturbing memorandum to the paralegal he believed reported him to the firm leadership. *Id.* Five weeks after the purported protected activity, the law firm decided to terminate Hutchins as a result of "the culmination of escalating problems with his superiors and with staff." *Id.* Several weeks later, plaintiff notified the United States Trustee that he believed the firm had engaged in fraudulent and unlawful billing practices, filed a pro se *qui tam* complaint under § 3729 of the False Claims Act, and alleged that the law firm violated the whistleblower provisions of the False Claims Act, 31 U.S.C. § 3730(h), by terminating his employment because of his investigation into the firm's billing practices. *Id.* at 181.

During the appeal of the ensuing retaliation suit, the Third Circuit engaged in an extensive discussion of whether plaintiff's activity constituted "protected conduct." The court held that "[a]lthough reporting 'fraudulent' and 'illegal' activity to an employer may satisfy the 'protected conduct' and notice requirements in many ... cases, in some instances where an employee's job duties involve investigating and reporting fraud, the employee's burden of proving he engaged in 'protected conduct' and put his employer on notice of the 'distinct possibility' that ... litigation is heightened." *Id.* at 191. While the court acknowledged that an employee may still engage in "protected conduct" even where the employee's job duties include investigating or reporting fraud, the employee would have to put the employer on notice that litigation is a distinct or reasonable possibility by characterizing the employer's conduct as illegal or fraudulent or recommending that legal counsel become involved. *Id.* at 192. The court ultimately declined to find that the plaintiff engaged in protected conduct, as follows:

> if an employee is assigned the task of investigating fraud within the company, that employee must make it clear that his investigatory and reporting activities extend beyond the assigned task in order to allege retaliatory discharge under § 3730(h). We see no evidence that Hutchins engaged in any conduct, beyond what was specifically asked of him in accordance with his job duties, that gave any indication that he was investigating fraud for a potential False Claims Act suit. He did not communicate that he was going to report the activity to government officials nor that he was contemplating his own *qui tam* suit.... He did not use the terms "illegal" or "fraud" nor did he attempt to discuss the billing practice with corporate counsel.... Rather, he merely performed

the task he was asked to complete by his supervisor.

*Id.* at 194 (internal citations omitted).

Numerous courts dealing with retaliation claims under the Fair Labor Standards Act ("FLSA"), Title VII, the Uniformed Services Employment and Reemployment Rights Act ("USERRA"), and other statutes—all of which apply the same *prima facie* case elements as Title IX—have held that in order to engage in a statutorily protected activity the employee must "step outside his or her role of representing the company and file an action adverse to the employer, actively assist other employees in asserting ... rights, or otherwise engage in activities that reasonably could be perceived as directed towards the assertion of rights protected...." *Claudio–Gotay*, 375 F.3d at 102 (quotation omitted); *see also McKenzie*, 94 F.3d at 1486–87 (an employee who, in her capacity as personnel manager, informed the company that it was at risk of claims that might be instituted by others as a result of its alleged FLSA violations, did not engage in activity protected under FLSA's anti-retaliation provision; such actions were not adverse to the company and were completely consistent with her job duties); *Samons v. Cardington Yutaka Techs.*, Civ. A. No. 08–988, 2009 WL 961168 at *7 (S.D.Oh. Apr. 7, 2009) (finding that plaintiff did not step outside her role as human resources manager where she alerted the company about alleged FLSA violations as part of her job duties and did not complain about these alleged violations on behalf of herself or other women employees from a standpoint adversarial to the company); *Bradford v. UPMC*, Civ. A. No. 04–316, 2008 WL 191706, at *4 (W.D.Pa. Jan. 18, 2008) (noting that neither investiga-

tions of another employee's EEO complaint regarding racial discrimination nor her recommendations to supervisors regarding the complaint constitutes protected activity, as plaintiff was not stepping outside her role as human resources manager); *Cook v. CTC Comm'ns Corp.*, Civ. A. No. 06–58, 2007 WL 3284337, at *6 (D.N.H. Oct. 30, 2007) (holding that in order to show protected activity, the plaintiff had to establish that she acted outside of her role as a human resources manager when she advocated on behalf of an employee's USERRA rights); *Hill v. Belk Stores Svcs., Inc.*, Civ. A. No. 06–398, 2007 WL 2997556, at *1 (W.D.N.C. Oct. 12, 2007) ("actions within the scope of an employee's duties are not protected for purpose of Title VII.").

In the case at bar, the Court similarly finds that notwithstanding Plaintiff's good faith belief that the College was not in compliance with Title IX, and notwithstanding her efforts to make the College administration aware of this noncompliance, Plaintiff never stepped outside of her role as Athletic Director to put the College on reasonable notice of potential legal action relating to any Title IX issues. Dating from her appointment in 1990, Plaintiff understood that part of her job description included looking at the subject of gender equity under Title IX. (Atkinson Dep. 364:9–365:3.) Indeed, throughout her deposition testimony, Plaintiff repeated her belief that she was hired and expected to examine Title IX violations. (*Id.* at 555:22–556:13, 572:3–574:11, 576:2–12.) During her tenure, the College, under her guidance and advocacy, made regular efforts to address and improve upon Title IX issues. (*Id.* at 272:12–24.) Plaintiff never suggested that the College opposed her Title IX efforts. (*Id.* at 556:19–557:10) As such, her advocacy was not adverse to the College's interests, but rather was precise-

ly what the College expected of her in order for it to avoid Title IX compliance issues. Plaintiff now produces no evidence that, at least during the time period from January 1990 to May 1998, she stepped outside the role for which she was hired by the College.

Plaintiff attempts to rescue her claim by cryptically arguing that,

> In bringing these continuing inequities to Dean Kissiah's and President Rothkopf's attention in the context of Title IX compliance, Dr. Atkinson was clearly characterizing the then current state of athletics at Lafayette as being in violation of Title IX. Thus, even though Title IX compliance was part of Dr. Atkinson's job duties, she clearly went beyond those job duties and engaged in conduct that is 'protected' under Title IX.

(Pl's Resp. Mot. Summ. J. 17.) Plaintiff's bald allegation, however, fails to meet her "heightened" burden of showing that her actions put the College on notice that litigation against it, due to Title IX violations, was a "reasonable possibility." *Hutchins*, 253 F.3d at 191–92. Rather, the record reveals a generally productive dialogue between Plaintiff and the College regarding the College's Title IX compliance and its efforts to adopt, within its funding limitations, her recommendations to improve compliance. Plaintiff admitted that the College, from 1990 to 1998, had, at her insistence, made improvements in its Title IX compliance. (Atkinson Dep. 575:21–576:10.) She acknowledged that she repeatedly had discussions with members of the College administration, who supported her efforts, "within reason," to improve the College's compliance with Title IX. (Atkinson Dep. 571:3–574:11; *see also* Pl.'s Resp. Mot. Summ. J., Ex. W (1996 memorandum by Dean Kissiah commending Plaintiff on organizing athletic department and reacting favorably to many of her Title IX

suggestions).) She also testified that she was "encouraged" by the College president to address issues of disparities in the athletic program between men's and women's sports and that the College made "constant progress" in increasing the percentage of equity on the women's side "as required by law." (Atkinson Dep. 161:16–162:7.) Ultimately, the College's self-study report to the NCAA recognized many of the shortcomings identified by Plaintiff and included many of her recommended changes to the Athletic Department to ensure Title IX compliance. (Atkinson Dep. 578:23–579:8; *compare* Pl's Resp. Mot. Summ. J., Ex. E *with* Def.'s Mot. Summ. J., Ex. D.) As of May of 1997, Plaintiff believed that the College had made significant progress and she believed the College "should be commended" for ultimately obtaining NCAA certification. (Atkinson Dep. 577:20–579:8.).

In short, for the period from January of 1990 to May of 1998, Plaintiff has not produced any evidence sufficient to create a genuine issue of material fact as to whether she engaged in "protected activity" for purposes of her Title IX retaliation claim. Undoubtedly. Plaintiff repeatedly and aggressively raised issues regarding the College's non-compliance with Title IX in the athletic department. She fails to recognize, however, that this advocacy was, in part, precisely what the College hired her to do. Although the changes she sought required substantial effort on her part, nothing in the evidence before the Court suggests that the College ever opposed her efforts or sought to avoid Title IX compliance. To now suggest that her actions constituted protected activity would open the College to a lawsuit any time it terminated someone hired in such a compliance role. As our jurisprudence has precluded such activity from falling within the ambit of Title IX protection, the Court must find that this conduct was not "protected activity."

### b. *May 1998 to November 1999*

Likewise, the evidence of record, viewed in the light most favorable to Plaintiff, reflects no protected activity from May 1998 to Plaintiff's termination in November 1999. To briefly re-summarize the events of this period, the NCAA, in May 1998, determined that the College should be certified as compliant with Title IX. (Atkinson Dep., Ex. 30.) Plaintiff, however, felt that there were areas in which the College could become more compliant with federal law. (*Id.* at 560:15–22; 571:10–572:19.) In order to increase opportunities for women coaches and athletes, Plaintiff originally proposed to the administration that additional money be put into athletics. (*Id.* at 575:7–9.) President Rothkopf, however, strongly opposed spending any more money on athletics, as a whole, and instructed Plaintiff to shuffle the department's budget to obtain the goals she wanted. (*Id.* at 573:12–575:15; 585:16–586:21; 590:17–591:7.) In turn, Plaintiff devised a strategy to cut certain sports, while adding others, in order to ensure Title IX compliance. (Muhlfelder Dep. 38:24–41:7; Rothkopf Dep. (2008), Ex. 58. 14.) The Board of Trustees, however, temporarily rejected her proposal in favor of a broader study of the athletics program at the College. (Rothkopf Dep. (2008), 33:14–35:7.) During this study, Plaintiff and President Rothkopf took conflicting stances on the proposal to either eliminate football entirely or, alternatively, move from Division 1 to Division III status to save money. (*Id.* at 588:7–14.) Plaintiff specifically called a meeting with all student-athletes seeking their support in opposing any divisional change. (*Id.* at 588:20–589:1, Ex. 17.) Ultimately, in January of 1999, the Board elected to retain the College's Division I status and to con-

duct an additional capital campaign for athletics. (*Id.* at 552:7–18.) The added funding resulted in the addition of three new coaching positions, all designated for women's sports. (*Id.* at 552:7–555:21.)

During her deposition, Plaintiff, on several occasions, concisely summarized the nature of this dispute with the College from May 1998 forward as involving not Title IX, but rather general funding concerns:

Q. You believe you were being discriminated against or retaliated against because you oppose the budgetary allocations to men's and women's sports?

A. It's not opposed. It's the issue that more funding—I was very clear on more funding, and the president knew this, the president knew this from board meetings, the members of the board knew it from 1996, the more money needed to be spent. It's written in the board documents and the president knew that.

Q. So it had to do. however, with the funding of the men's and women's programs?

A. That's correct.

(Atkinson Dep. 339:11–340:5.)

Q. So it comes down, once again, either find the money within the existing resources or go get more resources; is that right?

A. Yes.

Q. And the president's view was he wanted to spend money differently than you did. That is to say, he didn't want to increase the athletic department budget more than the 2 percent that everybody got.

A. You'd have to ask him.

Q. And when you didn't agree with him, he said, well, then find out whether you can save money within your budget; is that right?

A. That's correct. Both he and Dean Kissiah, yes.

Q. And—and you set about doing that.

A. I did.

Q. And then the issue became really more of a board issue, are we going to change some of the sports activities within the program or are we going to get more money?

A. Yes.

Q. And, eventually, the decision was get more money.

A. Yes.

Q. And, throughout, weren't you being made aware that there was a general desire to be compliant with Title IX with the question being how do we get the money to do so?

A. You can desire all you want. You have to be in compliance with the law. Title IX came into effect in 1972. To me, my job is to protect the university, the college, so that they would not be vulnerable. That's why I kept pushing so hard, that they would be in total compliance.

Q. ... Your position on the facts is that you were urging additional steps for gender equality; is that right?

A. Yes.

* * *

Q. Am I correct that this question of getting whatever steps were necessary taken to increase gender equity was a matter of the source of the funds either from within the existing budget or raise more money?

A. Yes. More money was needed to solve the problem or you had to shuffle the money that you had.

Q. Either one.

A. Yes.

\* \* \*

Q. And, for example, Ms. Muhlfelder was entirely supportive of your effort to try to get better gender equality; wasn't she?

A. She was supportive.

Q. And she was the person within the university who was responsible for determining whether there was compliance with law; is that right?

A. She was the administrator in charge of that review, yes.

(Atkinson Dep. 629:1–633:11.) Assistant Athletic Director Patricia Fisher, Plaintiff's friend and colleague,[6] agreed that the debate over Division I or Division III had nothing to do with women's sports and would have had no greater impact on women's sports over men's sports. (Fisher Dep. 30:19–32:19.)

Such evidence fails to create a genuine issue of material fact as to whether Plaintiff engaged in any Title IX protected activity during this period. As noted by the United States Supreme Court, " '[s]o long as it is 'possible to discern from the context of the statement' that an individual opposed an unlawful practice, public expressions of opposition . . . are also pro-

tected.' " *Dawn L.*, 586 F.Supp.2d at 374 (quoting *Curay–Cramer*, 450 F.3d at 135–36). From the time period of May 1998 forward, however, Plaintiff's complaints to the College and its administration did not oppose unlawful Title IX practices, but rather were focused on: (1) whether the College would provide more funding for athletics, to the detriment of other areas of the College, or whether money already within the budget should be shuffled so that Plaintiff could make changes she deemed necessary; and (2) whether the College should cut men's football or move athletics to Division III status to free up more money. Although Plaintiff ultimately wanted to use the additional funding to work on further Title IX compliance issues,[7] such desires did not convert her dispute with College administration into one implicating Title IX. Indeed, as Plaintiff herself conceded, Title IX compliance could have been achieved by either getting more money or shuffling the money that already existed—the dispute was over which of those options would be utilized. (Atkinson Dep. 631:24–632:22.) As such general complaints only tangentially involved Title IX, Plaintiff fails to establish the clear, direct complaints of Title IX violations which constituted protected activity in this time period.[8]

---

**6.** In her Response brief, Plaintiff indicates that Fisher was the person who probably worked most closely with her. (Pl.'s Resp. Mot. Summ. J. 11.)

**7.** Plaintiff cites to her outline for a presentation to the Board of Trustees Committee on Athletics and Student Affairs on December 3.1998. (Pl.'s Resp. Mot. Summ. j. Ex. H.) In that four-page outline, setting forth Plaintiff's various bases for wanting to retain Division I status, Plaintiff references a single bullet point, wherein she stated, "Women's Head and Assistant Coaches support = our only area where we are out of compliance . . . it is the law, it *must* be fixed . . . Lawsuits could be filed by football players if football is

dropped, Lafayette would be out of participation compliance with Title IX on the men's side." (*Id.*)

While this statement undoubtedly relates to Title IX, it was merely a small portion of an otherwise lengthy presentation to the Board discussing the implications, financial and otherwise, of the Division I versus Division III issue. This exhibit thus supports the Court's finding that Title IX advocacy was not the focus of her disagreement with the College, but simply part of her argument as to why the College should not change divisions.

**8.** Defendant also argues that, in this time period. Plaintiff did not have a good faith. reasonable belief that the college was in viola-

### 2. *Causation*

Plaintiff's *prima facie* case similarly fails on the element of causation. Causation, "which necessarily involves an inquiry into the motives of an employer, is highly context-specific." *Kachmar v. SunGard Data Sys.*, 109 F.3d 173, 178 (3d Cir.1997). At this stage of the litigation, the plaintiff must proffer circumstantial evidence "sufficient to raise the inference that [plaintiffs] protected activity was the likely reason for the adverse employment action." *Id.* at 177 (quotations omitted). A plaintiff may not normally satisfy his or her burden in that regard by simply pointing to the fact that an adverse employment action occurred after engaging in protected conduct. *Rodriguez v. Torres*, 60 F.Supp.2d 334, 339 (D.N.J.1999). As a general rule, a plaintiff may show causation in any of the following three ways: (1) "[i]n certain narrow circumstances," by the timing of the adverse reaction vis-a-vis the protected activity; (2) by a pattern of animus during the interval between the protected activity and the adverse action; or (3) by other circumstantial evidence concerning the employer's motivation, including inconsistent reasons given by the employer for terminating the employee or the employer's treatment of other employees. *See Theriault v. Dollar Gen.*, 336 Fed. Appx. 172, 174–75 (3d Cir.2009).

Although a temporal link is the most common method of proving causation, the Third Circuit has not articulated a hard and fast rule regarding what constitutes sufficient temporal proximity. Nonetheless, it has generally eschewed an inference of causation where a span of several months has passed between the protected activity and the adverse action. *See, e.g., LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n*, 503 F.3d 217, 233 (3d Cir.2007) ("a gap of three months between the protected activity and the adverse action, without more, cannot create an inference of causation and defeat summary judgment."); *Williams v. Phila. Hous. Auth.*, 380 F.3d 751, 760 (3d Cir.2004) (two months lapse between protected activity and adverse action is too long to permit an inference of causation); *Brown v. Boeing Co.*, 468 F.Supp.2d 729, 736 (E.D.Pa.2007) ("the three- to four-month period between the participation in the protected activity and the adverse employment action, in the absence of any other supportive evidence, raises, at best, a weak inference of causation."); *George v. Genuine Parts Co.*, Civ. A. No. 04–108, 2007 WL 217684, at *11 (W.D.Pa. Jan. 25, 2007) (finding that a three-month gap "is not so close as to be unusually suggestive of retaliatory motive, especially where an obvious and unimpeached non-retaliatory motive exists." (internal quotation marks omitted)).

Notably, however, the "mere passage of time is not legally conclusive proof against retaliation." *Robinson v. Se. Pa. Transp. Auth., Red. Arrow Div.*, 982 F.2d 892, 894 (3d Cir.1993). A plaintiff may demonstrate causation by showing an intervening pattern of harassment, antagonism, or hostility. *Id.* at 895; *see also Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 503 (3d Cir. 1997) ("[w]hen temporal proximity between protected activity and allegedly retaliatory conduct is missing, courts may look to the intervening period for other evidence of retaliatory animus."); *Drwal v. Bor. of W. View, Pa.*, 617 F.Supp.2d 397, 422 (W.D.Pa.2009). On the other hand,

tion of Title IX. It bases this argument on the fact that the College had been found compliant with Title IX and on Plaintiff's admission that she thought the College's program was gender equitable. Having already found that Plaintiff's complaints to the College during this time did not directly implicate Title IX, the Court need not analyze whether Plaintiff had a good faith, reasonable belief that the College had violated Title IX.

where there is no evidence of retaliatory animus during the intervening period "the passage of a long period of time between protected activity and an alleged retaliatory action weighs against a finding of a causal link." *Shaner v. Synthes,* 204 F.3d 494, 505 (3d Cir.2000) (citing *Krouse,* 126 F.3d at 503–04) ("Absent evidence of intervening antagonism or retaliatory animus, we conclude that the passage of time [between the filing of plaintiffs charge and the alleged retaliatory action] in this case is conclusive and that [plaintiff] failed to establish a causal link as a matter of law.")

Even taking the evidence in the light most favorable to Plaintiff, a reasonable jury could not infer that the College terminated Plaintiff for engaging in protected activity. First, Plaintiff has presented no evidence that the Defendant considered her Title IX views in a negative way, such that her advocacy was a motivating factor for her termination. Rather, the record unequivocally reveals that the College repeatedly encouraged Plaintiff to ensure Title IX compliance. In exchange for her efforts over a nine-year period, she was rewarded with pay raises and a continuation of her term of employment. Further, the College, far from reacting with hostility, took heed of many of Plaintiffs suggestions and incorporated them into the athletic program.

Second, Plaintiff presents no direct or circumstantial evidence that when the Defendants decided to terminate Plaintiff, they did so in retaliation for her outspoken involvement in seeking Title IX compliance. While her deposition testimony implicates others who "may" have knowledge of her termination due to her Title IX advocacy, her response to the motion for summary judgment is glaringly devoid of reference to testimony from any other individual. Instead, she relies purely on her own speculation and conjecture to support her claim. (Atkinson Dep. 547:9–550:23 (stating that she could only testify as to her "belief" that termination was due to Title IX activities).) "It is well established, however, that mere pronouncements or subjective beliefs ... [are] not a substitute for competent evidence." *Lisbon v. United Nat. Group Ins. Co.,* Civ. A. No. 03–6207, 2006 WL 446072, at *9 (E.D.Pa. Feb. 21, 2006) (quotation omitted). Indeed, throughout her deposition testimony, Plaintiff admits that she could not even pinpoint Title IX as the sole cause for her termination, often surmising that there may have been multiple reasons. (Atkinson Dep. 217:1–220:19 (suggesting that her termination was due both to her complaints of sexual discrimination against her and due to her Title IX activities); *Id.* at 365:4–366:6 (suggesting that her termination was due to (1) her Title IX activities, (2) her reporting that Dean Kissiah threatened her, (3) her age, and (4) her salary.)

Third, there is a complete absence of any temporal proximity between Plaintiff's legitimate Title IX complaints and her termination in November 1999. Through May of 1998, Plaintiff clearly engaged in extensive advocacy for Title IX compliance. Assuming such advocacy constituted "protected activity," nothing in the evidence allows the inference of a causal connection to her termination twenty months later. Indeed, Plaintiff's own testimony revealed that she engaged in these types of Title IX activities since her employment date in January of 1990 and, over the course of the years, was rewarded, not with hostility, but with encouragement from the administration. Logic rejects any inference that if the College were truly opposed to her consistent advocacy of Title IX, it would wait almost a decade to retaliate against her.

With respect to the period following 1998, even assuming that Plaintiff was actually opposing the College's resistance to Title IX compliance, Plaintiff similarly fails to make a causal connection to her termination. In her deposition, Plaintiff conceded that, after the NCAA certification, she reported to the Board committee that the only area in which the College remained out of compliance was in the realm of hiring sufficient women's head and assistant coaches. (Atkinson Dep. 594:22–9.) As of January 1999, the Board of Trustees Committee on Athletic and Student Affairs concluded that additional money should be put into athletics and, as of April 1999, money was officially made available for three new coaching positions in women's sports. These activities, in Plaintiff's view, put the College into full compliance with Title IX.[9] (Atkinson Dep. 553:7–555:21.) As such, Plaintiff had no good faith, reasonable belief, after April of 1999, that the College was out of compliance with Title IX. Nonetheless, her termination did not occur until November 1999—seven months later. Such a gap in time eliminates any temporal proximity between Plaintiff's communications and her adverse action.

In order to bridge this temporal gap, Plaintiff points to several events that allegedly demonstrate "a pattern of hostility and retaliation from which a fact finder could find a causal connection between Dr. Atkinson's protected activity and the various adverse actions taken against her." (Pl.'s Resp. Mot. Summ. J. 21.) First, she claims that in November of 1998, while she was raising Title IX concerns regarding the need to hire full-time coaches for women's sports, she was verbally attacked by Dean Kissiah. Plaintiff admitted, however, that the disagreement arose when Kissiah inflated numbers Plaintiff had prepared regarding the cost of running a Division I athletics department. (Atkinson Dep. 174:11–176:20.) She became angry, not because he was trying to undermine her Title IX efforts, but because, in her words, "he wasn't playing fair" by presenting documents at the meeting that he had not previously shared with Plaintiff. (*Id.* at 170:1–9. 334:16–336:23; 407:15–408:24.) Nothing in this incident, which occurred one year prior to her termination, reflected any discussion of Title IX, Plaintiff's complaints about Title IX compliance, or Dean Kissiah's resistance to Title IX compliance.[10]

9. Specifically, Plaintiff testified:

Q. And if I am correct and if you looked at that resolution with me a while ago, from the April 9 committee meeting where it stated that the committee recommends that the money be made available for these full-time coaching positions in which we then found to be the three you had recommended, that need was met, was it not?
A. When they were hired?
Q. Yes.
A. Yes.
Q. So if there was some, in your view, out-of-compliance situation, the college became in compliance when, as a result of this study of what should happen in the athletic department budget, a decision was made to increase the amount available so that additional coaches could be hired.

A. Right. After an eight-year push for this, yes. And that—that's just under—since I've been athletic director. I can't speak to previous administrations, but I'm sure they pushed, too.
Q. So would we say that then, according to your own words, the university or the college was at the point at which it got this extra money available and the coaches were hired was now in compliance with Title IX?
A, I'd have to look at the gender equity plan and the statistics, but after the money was raised and put into the athletic program, yes.
(*Id.* at 595:10–597:1.)

10. Notably, Plaintiff repeatedly indicated that she believed her reporting of the Kissiah incident—which had no Title IX connection—may actually have been the catalyst for her termination. (*Id.* at 365:4–15; 550:6–16.) This

Second, Plaintiff argues that, in April 1999, the component of intramurals and recreation was taken out of her supervision purportedly to weaken her faculty position and tenure status. (*Id.* at 286:12–287:7.) Specifically, during a brief meeting with Dean Kissiah, he informed her that he was removing intramurals from her supervision, that there was to be no discussion about it, and that she was to focus more of her efforts on the varsity athletic program. (*Id.* at 513:16–8.) Aside from her bare assertion. Plaintiff offers no evidence, however, that such an action constituted any form of hostility sufficient to close the causal gap between her alleged Title IX protected activity and her termination.[11] Indeed. President Rothkopf explained that the College was spending S25 million dollars to add approximately a hundred thousand square feet of intramural space, and he expressed "serious concern" to Dean Kissiah as to whether Plaintiff was the appropriate person to be in charge of that program. (Rothkopf Dep. (2008) 54:13–20; Rothkopf Dep. (2002) 103:4–105:17.) Ultimately, the College restructured its departments so that intramurals would be removed entirely from the Athletics Department and put under the supervision of the Assistant Dean of Students and Director of Recreation Services. (Kissiah Dep. 103:22–105:16.) The Athletics Department, which remained under Plaintiff's supervision, was then set up to deal solely with intercollegiate athletics. (*Id.* at 106:8–107:2.) Plaintiff's speculation that this entire restructuring was done purely as a hostile act finds no support in any evidence of record.

Finally, Plaintiff contends that, starting in January 1999, Dean Kissiah raised concerns to President Rothkopf regarding Plaintiff's leadership and, in August, prepared a performance evaluation of Plaintiff riddled with unsupported criticisms. The Court, however, does not find that these events suffice to close the temporal gap. First, the evaluation was completed in August of 1999, at least four months after her last purported protected activity. Second, the evaluation, while containing some criticisms, made multiple, positive appraisals of Plaintiff's job performance. Her ultimate approval rating was "Meets Expectations," which fell squarely in the middle range of the evaluation. (Pl.'s Resp. Mot. Summ. J., Ex. M.) Viewing the evaluation in the light most favorable to Plaintiff, no reasonable factfinder could find that it was unduly harsh, such that it could represent a pattern of animus.

In short, despite the absence of temporal proximity between her last possible Title IX statement and her termination. Plaintiff has failed to show any "pattern of antagonism" in the intervening time period from which a factfinder could conclude that Plaintiff was the subject of retaliation. Notably, at several points throughout her deposition, Plaintiff testified that, at the time of her termination, she had no idea what the basis of her dismissal was. (Atkinson Dep. 627:10–17; 646:17–647:16.) Had Plaintiff truly believed the above activities to be hostile or antagonistic, logic suggests that she would have had some sense of the basis of her termination at the time of the termination. Her seemingly *post hoc* efforts to piece together certain events to create a Title IX retaliation case fail to withstand summary judgment scrutiny. Therefore, even viewing the evi-

---

testimony undermines any suggestion that her Title IX activities were the cause of her termination. .

**11.** As noted by Defendant, Plaintiff has not previously and does not now assert that the

removal of intramurals from her supervision was a separate adverse action taken against in retaliation for her Title IX activity.

dence in the light most favorable to Plaintiff, the Court holds that a reasonable jury could not find a causal link between the purported protected activity and the adverse employment action in this case.

### B. *Whether Plaintiff Has Rebutted Defendant's Legitimate Non–Discriminatory Reasons*

 Finally, even giving Plaintiff the ultimate benefit of the doubt and assuming that Plaintiff could establish a *prima facie* case, summary judgment would nonetheless be warranted. Once a plaintiff successfully demonstrates a *prima facie* case of discrimination, the burden of production shifts to the defendant to articulate a legitimate, non-discriminatory reason for the adverse employment decision. *Simpson v. Kay Jewelers*, 142 F.3d 639, 644 (3d Cir. 1998). The burden on the defendant at this juncture is "relatively light," and the defendant can satisfy this burden "by introducing evidence which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for the unfavorable employment decision." *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir.1994). "The employer need not prove that the tendered reason *actually* motivated its behavior, as through this burden-shifting paradigm the ultimate burden of proving intentional discrimination always rests with the plaintiff." *Id.*

Once a defendant offers such evidence, the burden returns to the plaintiff to prove, by a preponderance of the evidence, that the legitimate reasons offered by the defendant were not its true reasons, but rather were merely a pretext for discrimination. *Jones v. Sch. Dist. of Phila.*, 198 F.3d 403, 410 (3d Cir.1999). Notably, in meeting his or her burden, the plaintiff may rely on evidence submitted in support of the *prima facie* case, as well as additional evidence. *Id.* at 413–14. "[T]here is

no rule of law that the testimony of a discrimination plaintiff, standing alone, can never make out a case of discrimination that could withstand a summary judgment motion." *Weldon v. Kraft, Inc.*, 896 F.2d 793, 800 (3d Cir.1990). Indeed, because discriminatory conduct is often subtle and difficult to prove, a plaintiff may rely on circumstantial evidence to prove his or her case. *Id.*

Notwithstanding this principle, it remains well-established that, at the summary judgment stage, the plaintiff must "point to some evidence, direct or circumstantial, from which a fact-finder could reasonably either: (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more than likely than not a motivating or determinative cause of the employer's action." *Fuentes*, 32 F.3d at 764. In order to defeat a summary judgment motion, the plaintiff must produce evidence which would allow a factfinder "reasonably to infer that *each* of the employer's proffered non-discriminatory reasons was either a *post hoc* fabrication or otherwise did not actually motivate the employment action (that is, the proffered reason is a pretext)." *Id.* (internal citations omitted). Further, the plaintiff must "demonstrate such weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them 'unworthy of credence' and hence infer that 'the employer did not act for [the asserted] non-discriminatory reasons.'" *Id.* (internal citations omitted). Ultimately, "[t]he question is not whether the employer made the best, or even a sound business decision; it is whether the real reason is [retaliation]." *Keller v. Orix Credit Alliance, Inc.*, 130 F.3d 1101, 1109 (3d Cir.1997) (quotations omitted). Unless there is evidence of discrimination, the court is neither permitted

to get involved in the subjective business decisions of the employer, nor set its own employment standards for the employer. *Ezold v. Wolf, Block, Schorr and Solis-Cohen,* 983 F.2d 509, 527 (3d Cir.1992). As such, absent a sufficient showing of pretext by a plaintiff, a court may grant summary judgment. *See, e.g., Morrissey v. Luzerne County Cmty. Coll.,* 117 Fed. Appx. 809, 816–17 (3d Cir.2004) (affirming grant of summary judgment where plaintiff failed to present sufficient evidence to rebut defendant's legitimate nondiscriminatory reason for the adverse employment action); *Boehm v. Colonial Reg'l Police Dept.,* Civ. A. No. 99–1913, 2000 WL 554983, at *3 (E.D.Pa. May 5, 2000) (granting summary judgment where plaintiff did not present sufficient evidence to rebut defendant's legitimate nondiscriminatory reason for the adverse employment action); *Jones v. WDAS FM/AM Radio Stations,* 74 F.Supp.2d 455, 465–66 (E.D.Pa. 1999) (granting summary judgment due to plaintiffs failure to show pretext).[12]

As discussed in detail above, the College, via former Dean Kissiah and President Rothkopf, articulated several legitimate, non-discriminatory reasons for Plaintiff's termination. In particular, President Rothkopf noted that: (1) Plaintiff's leadership and management skills were deficient, leading her to alienate others in the administration and create low morale in the Athletics Department; and (2) Plaintiff exercised poor judgment and demonstrated insubordination to his administration by organizing a group of student athletes, during the Board of Trustee's dispassionate study of the athletic department, to oppose and protest the dropping of certain sports or changing the College's divisional status. Accordingly, the burden now shifts back to Plaintiff to prove that these reasons were not true, but rather were merely pretext for their retaliation against her for her Title IX activities.[13]

Plaintiff's two-page discussion of this issue fails to meet her burden. (Pl.'s Resp.

---

**12.** Plaintiff spends eight and a half pages of her brief summarizing the standards and evidence required to prove pretext. As most of Plaintiff's cited cases are used to demonstrate general, well-accepted principles for reviewing retaliation cases on summary judgment, and not to argue that they are factually similar to the case at bar, the Court does not individually address each of these cases.

**13.** The parties dispute whether the Third Circuit's prior decision in this case disposed of the issue of pretext. Specifically, in affirming this Court's grant of summary judgment on Plaintiff's claims of Title VII gender discrimination, the Third Circuit had the opportunity to consider these identical reasons proffered by Defendant as legitimate, nondiscriminatory reasons for her termination. The court determined that "[t]he District Court correctly found that Atkinson failed to point to any evidence that demonstrated weaknesses, implausibilities, inconsistencies, incoherencies or contradictions in Lafayette College's reasons for its employment decisions. A reasonable jury could not find that Atkinson's gender played a role in the decisions at issue."

*Atkinson,* 460 F.3d 447, 455 (3d Cir.2006). Defendant now contends Plaintiff's inability to show pretext earlier is "highly instructive, as the same evidence of pretext she presents here would have been applicable earlier." (Def.'s Mem. Supp. Mot. Summ. J. 15.) Defendant also contends that, under the recent case of *Tice v. Bristol–Myers Squibb Co.,* 325 Fed. Appx. 114 (3d Cir.2009), the Third Circuit's earlier ruling may be legally dispositive of whether Plaintiff can now prove pretext, regardless of the fact that Plaintiff is proceeding under a different legal theory here.

The Court declines to conclusively resolve this dispute of issue preclusion. First, the Third Circuit's opinion expressly reserved for this Court the issue of Plaintiff's Title IX retaliation claim, including the question of whether Plaintiff had proven pretext. *Atkinson,* 460 F.3d at 455 n. 9. Moreover, the parties have, since the date of the last decision, conducted additional discovery, which has never been considered by any court. As such, this Court chooses to reach the merits of pretext.

Mot. Summ. J. 31–32.) First, Plaintiff contends general pretext has been shown by Defendant's failure to articulate any reason for her non-reappointment either orally or in writing, until after commencement of the lawsuit. The Third Circuit has been clear, however, *"[p]ost hoc* explanations, like any self-helpful statement made after the initiation of a lawsuit, may be to some degree suspect. However, the mere fact that a defendant relies on a *post hoc* evaluation does not in and of itself create a factual dispute about whether the evaluation is pretextual." *Healy v. N.Y. Life Ins. Co.,* 860 F.2d 1209, 1215 (3d Cir.1988). Thus, to the extent a plaintiff attempts to argue "that a *post hoc* justification *ipso facto* creates a pretext, it is plainly wrong." *Id.*

Second, Plaintiff argues that Defendant's reason based on the quality of her leadership, poor relationships with college administration, and the low morale within the athletic department is baseless and pretextual. Specifically, she contends:

> It clearly appears from the evidence that, beginning in the fall of 1998, President Rothkopf began a campaign to ferret out any negative information regarding Dr. Atkinson he could. He specifically mandated that Dean Kissiah prepare the November 1998 performance evaluation that was critical of Dr. Atkinson's managerial and leadership skills, and sought adverse information regarding her from selected members of the Lafayette staff, relying on infor-

mation that was sometimes double and triple hearsay. At the same time he completely neglected to solicit any information about Dr. Atkinson from those members of the Athletic Department staff who worked most closely with Dr. Atkinson, including the Assistant Athletic Director, Patricia Fisher.

(Pl.'s Resp. Mot. Summ. J. 32.)

In support of this argument, however. Plaintiff cites to no evidence—be it direct or circumstantial—that would lend any ground to her contention. President Rothkopf testified that he spoke with Larry Ramer, the Chairman of the Board of the College, Bill Rutledge, the chair of the Athletics and Student Affairs Committee, as well as many others in the Lafayette community about Plaintiff's leadership and management skills. (Rothkopf Dep. 63:11–23.) [14] Despite the fact that this case has been pending since 2001, Plaintiff has failed to depose any of these individuals in order to prove that their statements about her were either false or that these individuals were particularly adverse to her. Moreover, notwithstanding Plaintiff's claim that President Rothkopf sought out negative information, Plaintiff has failed to present testimony from any person at the College who could attest to her leadership abilities or good job skills. Indeed, in her Response, she identifies only one individual with whom she believes Rothkopf should have spoken—Patricia Fisher. Ms. Fisher's deposition testimony, however,

---

**14.** Specifically, Rothkopf indicated that spoke with: (1) Fred Quivey, the college's chief financial officer, who spoke on behalf of himself and his subordinates; (2) Gary Evans, vice president in charge of public information, who spoke on behalf of both Glen Airgood, the head of the office of public information at the College, and Scott Morse, the individual responsible for sports information; and (3) Ann Gold, the senior women's coach at the college. (*Id.* at 67:3–69:13.)

Plaintiff's reference to these statements being double and triple hearsay is irrelevant. President Rothkopf was entitled, in making his employment decision, to rely on head administrators at the College to report the sentiment of their staff. Hearsay issues would come into play only if Defendant attempted to introduce as evidence the statements of these staff members for the truth of the matter asserted.

contains no voucher for Plaintiff's management or leadership skills. To the contrary, Fisher explicitly commented that Plaintiff was "a tough person to work for," that she was vocal and "presented her things hard," and that she unilaterally set a standard that she wanted the College to live up to without fully understanding the College's other considerations and restraints.[15] (Fisher Dep. 15:24–16:1, 22:6–23–19.) In short, Plaintiff has presented no evidence that President Rothkopf's stated reason was either untrue or not credible.

Finally, Plaintiff disputes Defendant's proffered explanation that she exercised poor judgment and demonstrated insubordination to the College's administration by organizing a group of student athletes to protest the Division I to Division III change. In particular, she contends, without citation to the record, that:

> [T]he evidence demonstrates that the issue of changing from Division I to Division III arose every two years during Dr. Atkinson's tenure and, each time it arose, she was vocally opposed to the change. It seems incredible that her vocal opposition to the change suddenly constituted insubordination when it did not the other three or four times the issue was raised. President Rothkopf's credibility regarding this issue is further called into question by the fact that he insisted at his deposition that he supported the decision to stay Division I

when he clearly campaigned vigorously at various meetings of the Board of Trustees and otherwise for Lafayette to change to Division III.

(Pl.'s Resp. Mot. Summ. J. 31.)

This argument fails to create a genuine issue of material fact as to pretext for several reasons. Primarily, the Third Circuit has recognized that "[e]mployers who are dissatisfied with the performance of their employees sometimes voice express criticism to those employees, but employers do not always do so." *Keller,* 130 F.3d at 1111 (3d Cir.1997). Moreover, and perhaps more importantly, Dr. Rothkopf did not cite Plaintiff's *vocal* opposition to the division change as a basis for her termination. Rather, he explained that she was being insubordinate by organizing a group of student athletes, as well as coaching staff, to oppose any changes in the College's athletic program. He "considered her to be.. going beyond what was appropriate for an employee of the college, and she was pursuing an agenda inconsistent with that of the administration and the Board of Trustees." (Rothkopf Dep. (2008), 41:20–42:15.) He went on to explain that, "she was free to express her views within the context of the college's structure.... What she did that I believed insubordinate was to foment opposition to the study outside the structure of the committees and the committee structure of the college."[16] (*Id.* at 47:23–48:5.) Plaintiff's

---

**15.** Plaintiff also attaches, as an exhibit, the deposition of Wilbur Oaks, who was a member of the Board of Trustees at the College during Plaintiff's tenure. Mr. Oaks, however, repeatedly refers to a "division" between Plaintiff and the athletic coaches, and that the coaches complained about the amount of paper work she gave them. (Pl.'s Resp. Mot. Summ. J., Ex. G, Wilbur Oaks Dep. 15:1–17, 17:15–18:22, Nov. 26, 2008.) Such testimony bolsters Rothkopf's testimony that the morale

was low in the athletic department under Plaintiff's leadership.

**16.** Plaintiff cites to no testimony to support her statement that Rothkopf. at his deposition, claimed to support remaining at Division I. Rather, he simply stated that he agreed with the recommendation to stay Division I as part of a broader plan to reduced the number of sports at the College. (Rothkopf Dep. (2008) 29:19–30:16.)

failure to present evidence that she acted in such a fashion on any prior occasion undermines her effort to show pretext.

In sum, Plaintiff has failed to satisfy her burden of creating an issue of fact as whether any of the College's proffered reasons for her termination were mere pretext for an underlying effort to retaliate against her for her Title IX activities.[17] Notwithstanding the fact that this case has been pending for approximately nine years, and despite being made aware of the deficiencies in her proof by the Third Circuit's prior decision, Plaintiff has failed to present any evidence demonstrating weaknesses, implausibilities, inconsistencies, or contradictions in the Defendant's reasons, such that a reasonable fact-finder could rationally find them unworthy of credence.[18] Absent such a showing, the Court must grant summary judgment on this ground as well.

17. Plaintiff cites several cases for the proposition that summary judgment is inappropriate where, as here, the only evidence supporting a defendant's alleged legitimate business reason for its actions is oral. (*See* Pl.'s Resp. Mot. Summ. J. 28) (citing *Bhaya v. Westinghouse Elec. Corp.*, 832 F.2d 258, 262 (3d Cir. 1987); *Barber v. CSX Distrib. Servs.*, 68 F.3d 694, 700 (3d Cir.1995); *Sheridan v. E.I. DuPont de Nemours and Co.*, 100 F.3d 1061, 1072 (3d Cir.1996).)

Plaintiff's argument is misplaced. These cases stand for only the broader proposition, well-ingrained in our summary judgment standard, that "[e]valuation of witness credibility is the exclusive function of the jury, and where the only evidence of intent is oral, a jury could always choose to discredit it." *Bhaya*, 832 F.2d at 262. The Third Circuit has, however, reaffirmed that this proposition:

> does not mean that the courts in discrimination cases lose their traditional obligation, when faced with a motion for judgment as a matter of law, to review the adequacy of the showing presented to the factfinder. The district court must determine whether the plaintiff has cast sufficient doubt upon the employer's proffered reasons to permit a reasonable factfinder to conclude that the reasons are incredible, and our previous cases have explained in detail the plaintiff's burden in this regard.

*Sheridan*, 100 F.3d at 1072. Aside from baldly alleging that a jury may choose to disbelief President Rothkopf's oral proffer of reasons for her termination, Plaintiff has failed to cast any doubt, let alone sufficient doubt, upon these proffered reasons to allow a reasonable factfinder to conclude that the reasons are incredible.

18. Plaintiff also cites the case of *Sempier v. Johnson & Higgins*, 45 F.3d 724 (3d Cir.1995) for the proposition that the court should not undertake credibility determinations when considering a plaintiff's efforts to show pretext. In that case, plaintiff alleged age discrimination after being forced to resign. *Id.* at 726. The company cited poor performance as the reason, referencing the affidavits of two directors who had previously supervised plaintiff, reflecting their discontent with plaintiff's work. *Id.* at 730. Plaintiff responded with his own self-evaluation, combined with the affidavit of the company chairman attesting to the quality of plaintiff's work, two prior performance evaluations that revealed plaintiff's work to be satisfactory, and the coercive early retirement program implemented just prior to plaintiff's forced resignation. *Id.* at 731–32. The court found that such evidence permitted a jury to make the inference that the employer did not act for non-discriminatory reasons, but rather because of plaintiff's age. *Id.* at 732. As such, the court declined to grant summary judgment.

The current case is entirely distinguishable. Plaintiff presents no favorable reviews from any other administrators or supervisors at the College, no testimony from any member of her staff to counter the complaints that her leadership skills were poor, and no evidence that she was not insubordinate in her protest of the division change. Rather, she relies solely on her own claims of good performance. While the Third Circuit has recognized that an employee's self-evaluation of his or her work performance is relevant, such evidence standing alone is insufficient to prevent summary judgment in the face of evidence supporting the employer's legitimate, non-discriminatory reasons. *Id.* at 731 (citing *Billet v. CIGNA Corp.*, 940 F.2d 812 (3d Cir.1991)).

612

## IV. CONCLUSION

Viewing the evidence in the light most favorable to Plaintiff and resolving all factual discrepancies in Plaintiff's favor, the Court finds no genuine issue of material fact allowing Plaintiff to sustain a valid case of Title IX retaliation against the College. At the outset, Plaintiff's *prima facie* fails due to Plaintiff's inability to establish either that she engaged in protected activity or that any purported protected activity was the cause of her termination by the College. Moreover, even assuming a *prima facie* case existed, Plaintiff has not met her burden of pointing to evidence that would allow a factfinder to discredit the College's legitimate, non-discriminatory reasons for her termination. Accordingly, the court grants summary judgment on Count III of the Complaint and, in light of the previous dismissals of the other counts, enters judgment in favor of Defendant on the entirety of the Complaint.